McHugh, J.
This is a case in which plaintiff, William Trabilcy, seeks damages for what he claims was retaliatory action his employer, defendant ENSR Corporation, took against him as a result of a claim he filed with the Massachusetts Commission against Discrimination (“MCAD”). Specifically, Mr. Trabilcy claims that ENSR disciplined him for sending an intra-company e-mail and later placed him on “variable” employment status because of the MCAD complaint.[1]
The case came on for trial before the undersigned, sitting without a jury. Based on the evidence introduced during the course of the trial and the reasoned inferences I have drawn from that evidence, I find and conclude as follows:
FACTS
Plaintiff, William Trabilcy, joined defendant, ENSR Corporation, in 1986.[2] At all material times, ENSR has been engaged in providing a variety of engineering services to a variety of clients. Included among those engineering services are services in the environmental area. Initially, Mr. Trabilcy joined ENSR’s Health and Safety group. Later on, however, he transferred to the Hazardous Waste Group. Through various reorganizations, that group became, or became part of, the Environmental Management & Compliance group. Mr. Trabilcy was initially employed in the Property Transfer Assessment subdivision of that group. The Property Transfer Assessment subdivision later became the Client Service Group.
Michael Resch managed the Environmental Management and Compliance group. He supervised, among others, Scott Perry who headed the Property Transfer Assessment subdivision. Mr. Perry, in turn, was Mr. Trabilcy’s immediate supervisor.
At some point in late 1994 or early 1995, a number of senior employees of the Environmental Management and Compliance group left ENSR to begin working on their own. ENSR, of course, sought replacements and Mr. Trabilcy applied to become one of those replacements. He was not selected. Instead, a female named Diana Dehm was chosen for the position he wanted. As a consequence, on or about February 8, 1996, Mr. Trabilcy filed a complaint with the MCAD claiming that he had not been selected as a consequence of gender discrimination. That claim ultimately was dismissed but remained pending during the events described below. Mr. Trabilcy’s supervisors, including Michael Resch, were aware of the complaint when it was filed and were aware that it remained pending thereafter.
As an ENSR employee, Mr. Trabilcy had some significant strengths and some areas in which he decidedly needed improvement. ENSR, like many corporations, had a policy of providing its employees with annual performance reviews. Mr. Trabilcy's review for the period January 1, 1995 through December 31, 1995, showed “outstanding” performance[3] with respect to technical competence and knowledge, drive and commitment, teamwork and personal safety. The same review, however, showed that he “required improvement”[4] in the quality of his work, his overall productivity and his administration of projects. Finally, that review showed that Mr. Trabilcy “met the job requirements’’[5] in such things as dependability, planning and organization, project performance, financial management and team management.
Mr. Trabilcy’s supervisors discussed the foregoing report with him. He disagreed with it, was unhappy about it and, as a consequence of receiving it, thought about employment elsewhere. To that end, he actually discussed the possibility of employment with Laidlaw Waste Systems, Inc. toward the end of December 1995. Nothing came of his overtures to Laidlaw, however, and they were not contemporaneously known to his supervisors at ENSR.
In August of 1995, as the ENSR planners began to look at the upcoming year, they distributed to all employees “targets” at which those employees should aim with respect to their weekly billable hours. The planners targeted Mr. Trabilcy for 32 billable hours of a total of 44 he was expected to work each week. They expected him to spend the other 12, or 27% of his working time, on administration and project development. In that regard, ENSR supervisors told Mr. Trabilcy that, during 1996, they expected him to identify at least five potential clients and take measurable steps to develop business opportunities with them, to manage, from start to finish, an average of one to two site assessment proposal opportunities each week, to give at least one internal seminar[6] and to attend a variety of ENSR internal educational seminars.
Although the record does not fully disclose the details, 1995 apparently was a profitable year for ENSR. Unfortunately for all concerned, however, 1996 began on a very different footing. On March 19, 1996 ENSR’s President Robert Peterson distributed to all *400 employees a memorandum in which he stated that January and February of 1996 had been “two of the poorest months in recent history.” Continuing, Mr. Peterson stated that
[w]e lost money in both months. The combined loss was $664 thousand. The primary cause of this was the very low direct project hours in these months in C&E [one of the ENSR departments] in both periods.
Mr. Peterson’s memorandum continued by describing a variety of measures he hoped that ENSR employees would take to correct the situation. One of those measures, and the one with which the memorandum closed by detailing in some length, was increasing billable hours. Mr. Peterson’s memorandum ended by stating “I remain confident that we have talented people ‘who’ can pull off change that is required if we as a group [ ] acknowledge and understand the importance of the issues and work together with urgency to address [them].”
Understandably, Mr. Peterson’s memorandum created substantial tension within ENSR and sent, I infer and therefore find, many employees scrambling in many directions in order to find ways to increase their billable hours. Mr. Trabilcy was not, by any means, exempt from the tension-provoking impact of Mr. Peterson’s memorandum. Indeed, for some period, Mr. Trabilcy had been concerned about what he perceived was his exclusion from opportunities for billable hours he thought he should have had. Accordingly, on April 2, 1996 he sent the following e-mail to all ENSR employees:
Please note: Client needs or inquiries in occupational health and safety consulting, industrial hygiene, or indoor air quality services should be directed to me. Please let me know if you or a client have any questions or would like a list of representative project experience in these areas. I also have a three-fold marketing brochure describing some of these services. You can reach me at extension 3326.
At the time he sent that e-mail, Mr. Trabilcy had no supervisory authority over any ENSR employees, had no responsibility for assigning work within his own department or within any other department at ENSR and had no authority to direct, within his own department or elsewhere, other employees with respect to work allocation. Before he sent the e-mail, he discussed it with Scott Perry, his supervisor, who had reservations about the content of the message but who did not tell him not to send it.[7]
Adverse reaction to Mr. Trabilcy’s e-mail was immediate and forceful. Richard McGrath, Mr. Resch’s supervisor, brought it to Mr. Resch’s attention and told him that he wanted corrective action taken immediately. Mr. Resch likewise thought that the content of the e-mail was highly inappropriate because it purported to issue a command Mr. Trabilcy had no authority to issue. Moreover, Mr. Resch believed that both the content and the tone of the memorandum had the potential for an adverse impact on internal esprit at a time when tensions already were high.
Mr. Resch discussed the e-mail with Mr. Periy and with Carol Woloss, ENSR’s head of human resources. He discussed the e-mail with Ms. Woloss because he anticipated placing a reprimand in Mr. Trabilcy’s file and wanted to make certain that he knew and followed the requirements for doing so.
After discussing the e-mail with Mr. Perry and Ms. Woloss, Mr. Resch sent a “corrective e-mail to all employees.”[8] Mr. Resch then prepared a memorandum to Mr. Trabilcy entitled “Displeasure Regarding Your Health and Safety E-Mail Note” in which he outlined the reasons why Mr. Trabilcy’s e-mail had been inappropriate. Mr. Resch’s memorandum ended by stating that
[t]his type of behavior is unacceptable and will not be tolerated. Should this happen again, further disciplinary action up to and including termination, could result.
Mr. Resch met with Mr. Trabilcy, gave him the memorandum and discussed its content with him on April 8, 1996, the day he wrote the memorandum. Among other things, he told Mr. Trabilcy that he should not send any such e-mails in the future and that he had no authority to direct anyone to send work to anyone else, including himself. Mr. Trabilcy had little to say during tire meeting with Mr. Resch but, several days later, sent him a 2x/2-page memorandum in which he described the e-mail’s genesis. Mr. Trabilcy’s memo closed with the following:
I apologize for any misunderstanding or problems that the e-mail may have caused. However, I consider your memo to me as inappropriate, having been sent without any prior discussion with me in the matter. In light of all this, it appears that your memo was written without full knowledge of the situation, or, it may represent retaliation toward me in response to my filing a complaint against ENSR with the Massachusetts Commission Against Discrimination and EEOC. The threat of potential termination appears to be an extreme response, relative to the issue at hand.
In either case, I will continue to work diligently within the site assessment group as before. It is not my intent to act in a manner inconsistent with the department’s goals. However, it is my desire to maintain my position, progress, and billability as any consulting organization requires, especially in light of recent poor company performance and potential staff reductions. If you or [another ENSR supervisor] would like to discuss the matter further, please let me know.
Understandably, Mr. Resch considered that memorandum to be an inappropriate response from Mr. Trabilcy *401 and he did not respond to it. The e-mail matter ended at that point.[9]
Mr. Resch’s response to Mr. Trabilcy’s e-mail was generated by the tone and content of the e-mail, not by concerns Mr. Resch had regarding Mr. Trabilcy’s MCAD complaint or other extraneous matters. As a department manager of an organization experiencing financial difficulties, Mr. Resch was concerned with making certain that individual employees were not trying to save their own positions at the expense of others and that employees did not give the appearance of trying to do so. He was concerned, I infer and therefore find, with the possibility that an uncorrected manifestation of attempted “turf-building” like that Mr. Trabilcy’s e-mail represented could begin a stampede that ultimately would prevent ENSR from correcting the financial problems it then was facing.
Whatever efforts ENSR employees took to deal with the problems outlined in Mr. Peterson’s March 19 memorandum were unsuccessful in reversing the downward trend that memorandum noted. Accordingly, on April 29, 1996, ENSR distributed another memorandum to all employees, this one outlining the continued financial problems ENSR was experiencing and describing more structured and forceful steps ENSR was taking to deal with that continuing problem. Among those steps was a reclassification of many employees to “variable” status. As the memorandum, and subsequent memoranda on the same subject, described it, reclassification to “variable” status meant that the reclassified employees would be paid only for billable work they performed. They would not be permitted to attend staff meetings without permission, would have no administrative responsibilities and their benefits depended on the variable classification into which they were placed.[10]
The “variabilization” plan outlined in the April 29 memorandum had been the subject of heated discussions within ENSR before the plan was implemented. Many of the department managers did not believe it was an appropriate way to deal with ENSR’s problems while others did. As with any controversial plan of that nature, levels of enthusiasm with which the plan was discussed and implemented varied from person to person within ENSR itself.
ENSR’s “variabilization” plan called for re-classifying approximately 25% of all ENSR employees. All department managers, therefore, were directed to select 25% of their employees for “variable” status. Mr. Resch made the decisions for the Environmental Management & Regulatory Compliance group. Within the subgroup to which Mr. Trabilcy belonged, he selected Mr. Trabilcy, Jeanne Goulet, who had been the department’s “employee of the year” the previous year, and Carolyn Scott, who then was working part time because of child care. He did so because he believed that all three spent most of their time on billable projects and, as a consequence, could continue to receive approximately the same amount of income even after they were “variabilized.” In addition, he believed all three could be placed on variable status without substantial adverse impact on the department’s administrative needs.[11]
Before making his final decisions as to who was to be placed in a “variable” status, Mr. Resch discussed those decisions with his supervisor, Richard McGrath. During his conversation with Mr. McGrath, Mr. Resch mentioned Mr. Trabilcy’s then-pending complaint with the MCAD and asked if Mr. McGrath thought that the existence of that complaint ought to prevent ENSR from placing Mr. Trabilcy on variable status. Mr. Mc-Grath told Mr. Resch that pendency of the MCAD complaint should have no impact whatsoever on ENSR’s decision.
Mr. Resch’s decision with respect to the employees he would “variabilize” was a difficult decision. Regardless of how it was portrayed internally, placement in “variable” status had the appearance of a demotion. Moreover, the entire program had an adverse effect on the morale of ENSR employees. Nevertheless, I find, and conclude, that Mr. Resch placed Mr. Trabilcy on variable status because of his judgment with respect to Mr. Trabilcy’s capabilities and the needs of his department and not, in whole or in part, in retaliation for any complaint Mr. Trabilcy had made to the MCAD.[12] In that regard, however, I infer, and therefore find, that the e-mail incident and Mr. Trabilcy’s response to Mr. Resch’s correction led Mr. Resch to conclude that Mr. Trabilcy’s organizational talents and abilities were among the least important component of the resources with which he provided ENSR at least at that time and thus that, insofar as ENSR was concerned, they could be sacrificed with little adverse impact. That conclusion played a role in his decision to place Mr. Trabilcy in variable status.[13]
CONCLUSIONS
G.L.c. 151B, §4(4A) makes it unlawful for “any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right” to complain of discrimination that is prohibited by any provision of G.L.c. 151B. More simply, c. 151B, §4(4A) prohibits retaliation. Mr. Trabilcy claims that both the reprimand he received for sending the e-mail and the decision to place him on “variable” status were made in retaliation for his filing a claim with the MCAD.
Where direct evidence of retaliation is absent, as it is here, Mr. Trabilcy must prove his claim of retaliation inferentially. To do that, he must first of all prove by a preponderance of the evidence (1) that he filed a complaint with the MCAD, (2) that ENSR was aware of that complaint, and (3) after filing the complaint with the MCAD, ENSR subjected him to an adverse employment action. See MacCormack v. Boston Edison Co., 423 Mass. 652, 662-63 (1996).[14]
*402 Here it is beyond question that Mr. Trabilcy had filed a complaint with the MCAD and that that complaint was pending when he sent his April 2 e-mail and when ENSR made the “variabilization” decision. There also is no question that Mr. Resch knew of Mr. Trabilcy’s MCAD complaint shortly after Mr. Trabilcy filed it. Mr. Resch thus knew that the complaint was pending both at the time he took corrective action regarding the e-mail and at the time he made the “variablization” decision. Finally, there is no question that both the corrective action and the “variabilization” decision were “adverse” to Mr. Trabilcy.
Once Mr. Trabilcy proves the three elements just described,
[t]he burden then shifts to [ENSR] to articulate a legitimate, nondiscriminatory reason for its [employment] decision . . and to “produce credible evidence to show that the reason or reasons advanced were the real reasons.” [ENSR’s] “burden of production is not onerous.” “The reasons given for a decision may be unsound or even absurd,” and the action may appear “arbitrary or unwise,” nonetheless [ENSR] has fulfilled its obligation . . . [ENSR] is not required to persuade the fact finder that it was correct in its belief.
Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 128 (1997) (citations omitted).
Here, ENSR has met its burden. It has articulated a nonretaliatory basis for taking the action that it took, namely a belief that the e-mail was improper and unauthorized and had the potential to produce a further erosion of already impaired morale and a belief that Mr. Trabilcy could be “variablized” without detriment to his department and with an opportunity to preserve a substantial amount of the income he had earned before “variabilization.”
Once ENSR comes forward, as it has, with credible evidence to support a legitimate, nonretaliatory reason for its decision, the burden shifts back to Mr. Trabilcy to prove, by a preponderance of the evidence, that the articulated reason was a pretext. Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 444-45 (1995). That is a burden Mr. Trabilcy has not carried. On the contrary, I have found and I have concluded that the reasons ENSR assigned for the actions it took are the real reasons for those actions and they were unaffected by any retaliatory motives.
It is, of course, possible in retrospect — indeed, possible contemporaneously — to make a variety of decisions — all rational — regarding how a particular policy should be implemented and what considerations ought be given weight when the time comes to make specific personnel decisions designed to advance the policy’s objectives. Filing a discrimination complaint does not produce an invisible shield that thereafter wards off all adverse employment decisions. Here, there simply was no pretext and, although different people might have come to different conclusions regarding who in Mr. Trabilcy’s group should have been “variablized,” the decision Mr. Resch in fact made was a decision uninfluenced by any retaliatory animus.
ORDER
In light of the foregoing, and in light of the order earlier entered on ENSR’s motion for summary judgement, judgment will enter dismissing the complaint.

 This claim was part of a larger claim of discrimination Mr. Trabilcy filed against ENSR. The remaining components of the claim, however, were resolved in ENSR's favor as a consequence of ENSR’s motion for summary judgment.

 At the time, what became ENSR was known by another name. The precise details of merger and succession, however, are neither revealed by the record nor relevant to the present issues.

 The review criteria stated that fewer than 10% of the employees should receive such a rating.

 The rating criteria reserved that rating for fewer than 5% of ENSR employees.

 That rating was designed for 50% of the company’s .employees.

 ENSR employees frequently attended “brown bag" lunchtime seminars given by their colleagues on a variety of topics. The seminars were designed to spread internally at ENSR knowledge and expertise possessed by various ENSR employees.

 About a year earlier, Mr. Perry had sent a memorandum to Mr. Resch stating that the site assessment group of which Mr. Trabilcy was a part had not been receiving all of the internal company referrals for site-assessment work it should have. Mr. Perry asked Mr. Resch to insure that steps were taken to insure that the appropriate referrals were made to his group. That memorandum, however, did not say that all of the referrals should be made to Mr. Trabilcy. More important, it took the form of a class by a subordinate to a superior, did not purport to have any self-executing qualities and was not distributed to individuals other than those, including Mr. Trabilcy, who were directly concerned with its content or with implementing the request Mr. Perry was making.

 That e-mail stated as follows:
To clarify a recent e-mail, health and safety consulting services are provided in Acton by a team of individuals in the Environmental Management Department of the [Hazardous] Waste and [Environmental] Management [group]. This team consists of Stuart Sleemna, Diana Dehm, and Bill Trabilcy. This Acton staff is supported by Kevin Powers (on the Corporate Staff) and Kathy Harvey (on the Eastern Region staff). Health and safety services include health and safety auditing, occupational health and safety consulting, ergonomics, indoor air qualify services, exposure monitoring, asbestos, lead-based paint, lead in drinking water, and radon evaluations. Health and safety plans for our field activities are typically prepared by Kathy and/or Kevin.
If you would like more Information on Acton’s health and safety services, feel free to contact me, Stuart (x3156), Diana (x3395), or Bill (x3326). Requests for services should come through me as department manager.

 At trial, some effort was made to show that ENSR employees routinely used intra-company e-mail to solicit business for their departments and that, as a consequence, it was unfair to single out Mr. Trabilcy for punitive action as a consequence of the e-mail he sent on April 2. Those arguments and that effort are wide of the mark. The problem with Mr. Trabilcy’s e-mail was not that he was using a particular medium to alert others at ENSR to his availability to perform tasks within his specialty. The problem instead was that the *403 e-maü purported to give a command he had no right to give, that everybody knew he had no right to give and that, if followed, would have had the potential to take work from others who legitimately had an interest in the same or similar work. Moreover coming as the e-mail did at a time when all ENSR employees were trying to find ways to maximize their value to the company, the e-mail not only was particularly inappropriate but was particularly dangerous to organizational integrity as well.

 There were to be three classifications based on the expected number of hours employees were to work.

 There were, of course, other ways of analyzing job performance, historical and potential, before making the final decision. My findings concerned what Mr. Resch thought and decided, not what he should have decided or even what he could have decided.

 Mr. Trabilcy later filed a complaint with the MCAD alleging that he had been placed on variable status in retaliation for the earlier MCAD complaint he had filed. In response to that complaint, ENSR’s human resources director, Ms. Woloss, wrote a letter to the MCAD in which she stated, in part, that billable hours were “not a factor that was considered in” making the “variabilization” decision. Ms. Woloss did not testify at trial and the record does not reflect the basis for her statement. On the basis of the entire record, I am persuaded that, innocently, negligently or otherwise, Ms. Woloss was simply wrong. Billable hours, historical and potential, were a factor and were an important factor.

 As stated in the summary-judgment order I entered earlier, Mr. Trabilcy’s career at ENSR came to a conclusion shortly thereafter when he was fired for placing messages critical of ENSR and of his supervisors on the window of his office for passersby to see and replacing at least one of those messages after it had been taken down. By the time of his discharge for that reason, ENSR’s variabilization plan had not yet become effective.

 I assume for present purposes that the court must utilize the traditional burden-shifting approach to retaliation claims that it uses in claims of discrimination itself and that a prima facie case is made out by proof of the three elements just described. See generally, e.g., Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 127-28 (1997). There is, however, another approach.
In Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977), the Supreme Court articulated the standard of proof which governs claims of retaliation against protected speech. The plaintiff initially bears the burden of demonstrating that his conduct was constitutionally protected, and that his conduct was a “substantial factor” or “motivating factor” in the defendants' decision to dismiss him. When the plaintiff has met this burden, the burden shifts to the defendants to show “by a preponderance of the evidence that [they] would have reached the same decision .. . even in the absence of the protected conduct.” Id.
Harris v. Board of Trustees of State Colleges, 405 Mass. 515, 523 (1989). If that is the appropriate approach, the result is still the same. As my factual findings make clear, I am not persuaded that retaliation or a desire for retaliation was either a “substantial" or a “motivating" factor in the decisions ENSR made with respect to Mr. Trabilcy. Indeed, I am not persuaded that a desire for retaliation was present at all.